UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                    24 Cr. 147 (AS)

vs.

JOSEPH SPROLLING,

        Defendant.
_____

**DEFENDANT JOSEPH SPROLLING'S SENTENCE MEMORANDUM**

                                                      Law Office of Evan L. Lipton, P.C.
                                                      260 Madison Avenue, Floor 22
                                                      New York, New York 10016
                                                      (917) 924-9800
                                                      ell@evanliptonlaw.com
                                                      Attorney for Joseph Sprolling

**I.      Joseph Sprolling Should be Sentenced to Probation with a Period of Home Confinement**

This memorandum is respectfully submitted on behalf of Joseph Sprolling, scheduled to be sentenced on January 14, 2025, following his guilty plea to a one count information charging him with possession of a firearm after a felony conviction, and in support of his request for a sentence of probation including a substantial period of home detention. This non-guidelines sentence is justified in this case based on Mr. Sprolling's history and characteristics, including his challenging upbringing, and his role as a caregiver for his mother, and because he has started a new life in New Jersey, living with his mother and working the overnight shift at Teterboro airport, far from the Bronx neighborhood where he has been arrested in the past. Mr. Sprolling's performance at this job, which he obtained after a lengthy and unremitting search, demonstrates his extraordinary post-offense rehabilitation and has allowed him to catch up on child support obligations. His letter to the Court further demonstrates acceptance of responsibility, insight into the seriousness of his offense and lays out his plans for a productive, law-abiding future. For these reasons, a sentence of probation is "sufficient but not greater than necessary" to serve the purposes of section 3553(a).

**II.     The Underlying Bronx County Arrest and Subsequent Federal Charges**

On July 19, 2023, Mr. Sprolling was double-parked in a recently purchased 2011 Infiniti, about a block away from his job in a local convenience store and deli on 167th Street and Clay Avenue in the Bronx, waiting for a friend to return to the car. He had a .22

1

Caliber pistol that he used for protection at work tucked between the driver's seat and the center console. The vehicle registration was inconsistent with the make and model, drawing the attention of passing NYPD officers who approached Mr. Sprolling and spoke with him outside of the vehicle. After some discussion, Mr. Sprolling consented to a search of the car and they quickly located the firearm. Both Mr. Sprolling and his friend were arrested; the friend's arrest was voided after Mr. Sprolling took responsibility for the weapon.

Mr. Sprolling was initially charged with weapons possession in Bronx County and released without monetary bail. The case seemed to be progressing towards resolution. (Mr. Sprolling was enrolled in programming, attending the Fortune Society for job training as well as a weekly educational program addressing the scourge of gun violence in the Bronx. He anticipated a non-jail disposition upon completion of these programs.) However, four months after the Bronx arrest, on January 9, 2024, he was arrested by federal agents at a court appearance and brought to the SDNY where he had been charged by sealed complaint with being a felon in possession, based on a New York State felony conviction entered in 2009, based on conduct that occurred in 2005, when Joseph was twenty years old. (The reason that Mr. Sprolling was selected for federal prosecution is unknown.)

He consented to conditions of release including a $25,000 personal recognizance bond and a condition requiring him stay away from the Bronx, leading him to move into his mother's apartment in Teaneck, New Jersey, where he sleeps on the couch in the living room. (Beginning in 2019 he split his time between his mother's place and a girlfriend's apartment in the Bronx. To comply with conditions of release after his arrest he began to live full-time with his mother.)

### III.    Mr. Sprolling's Post-Arrest Conduct Strongly Suggests He Will Not Re-offend

In the year since his federal arrest Mr. Sprolling has turned his life around. He availed himself of every training program and work lead provided by his pretrial services officer and ultimately landed a great job as an aircraft technician. He is making a good wage, working lots of hours, and is doing it in an environment where he feels safe. He stays away from the Bronx because pretrial release conditions require him to, but also because he doesn't need to go there to earn a living. On a typical day, he wakes up, goes to the store to get medications for his mother, helps her around the house and goes to work. Sometimes he picks up his son after school.

In recommending fifteen months, the presentence report suggests that a prison sentence is necessary because Mr. Sprolling's "conduct is indicative that he has no respect for the law and he has no desire to change." PSR p. 26. This analysis, based, in part, on his prior conviction for criminal possession of a weapon in 2014 is understandable, but it is also wrong. It ignores his conduct in the year since his federal arrest, and it ignores the complexities of human thought and decision-making. It also does not give sufficient weight to the substantial challenges he faced during childhood. While the report correctly notes that his parents' substance abuse issues led to him being removed from his home at ten years old, it doesn't acknowledge that, once that happened, the state bureaucracy that exists to support kids like Joseph failed him.

Joseph was a victim of the neighborhood dealers who used him to run drugs, and a victim of his parents' neglect. This is why he entered the system. When it came time to

3

parole him back home, state investigators deemed his family apartment unfit and he was funneled into the juvenile justice system, then the foster care system. When he could not get along in foster care, he was put back into facilities for juvenile offenders, even though he had been adjudicated for a single drug sale years earlier.

Seen from this perspective, Joseph has exhibited an extraordinary desire and ability for change. Rather than being bitter or defeated, he continues to strive to better himself. Rather than resort to the underground economy he worked for a decade in a barbershop and convenience store. When he realized that wasn't enough to support himself, he began training to become a plumber, and when he was injured on the job, he went back to work at his old jobs while he recovered. And after his federal arrest, instead of sitting at home and waiting to go to jail, he found the best job of his life, far away from the area where he was arrested. This conduct strongly suggests that he will succeed. Incarcerating him now doesn't make sense. The Court should show Joseph that it believes that he can succeed by sentencing him in a way that does not interrupt this progress.

**IV.     Mr. Sprolling's Criminal History, all of which is non-violent, is a product of his family circumstances and the conditions in which he was raised. It is not indicative of criminal or anti-social tendencies or of a lack of desire to change or succeed.**

Criminal history is always relevant to assessment of recidivism. In a felon in possession case, it is also relevant to the nature and circumstances of the offense because the gravity of the conduct is related to the type of underlying felony. We should be more concerned, for example, when a person who has acted violently towards others subsequently possesses a gun than when the same crime is committed by a non-violent felon. It also matters when the prior felonies occurred.

In this case, Joseph was convicted of three non-violent felonies, all before his 22nd birthday. He completed his time in state prison without any disciplinary infractions and then successfully completed post-release supervision in 2012, when he was 27 years old. PSR ¶ 33. Despite the fact of his 2014 misdemeanor conviction for criminal possession of a weapon in the fourth degree (in circumstances remarkably like the instant offense) analysis of Joseph's criminal history shows that it is more closely associated with the circumstances of his upbringing than to any underlying antisocial tendencies. Recent changes in his life strongly suggest that he will not re-offend.

1.     **Joseph's first ten years: 1985 to 1995.**

Joseph was born in the Bronx in 1985 and is thirty-nine years old. He was raised by his mother, Jaclyn Sprolling, and a stepfather, Ernest Darby. They lived together in a one-bedroom apartment at 371 East 165th Street along with an older brother, Thomas Sprolling. Jaclyn had previously been married to Santana Sprolling, who is Thomas's father.

5

Although Joseph shares Santana's last name, he is not Joseph's father. Joseph has never met his biological father. He felt that Ernest was his dad, and they shared a good relationship. PSR ¶ 45. Ernest worked as a long-haul truck driver. Both Ernest and Jaclyn abused cocaine and alcohol.

Joseph was first arrested in 1995 when he was caught a few blocks away from the family home in College Avenue acting as a runner for a neighborhood crack dealer. He was ten years old and in sixth grade. As a result of this one arrest, he spent the rest of his childhood in a mix of juvenile justice facilities and foster care, never again spending more than a few nights in the apartment. He was initially sent to city juvenile facilities for pre-trial detention; first the "Hunt's Point Barge", a floating jail anchored across from Rikers Island, then Horizons Juvenile Center in the Bronx.

Resolution of juvenile criminal charges includes an investigation of family circumstances to determine whether the child should return home. When ACS workers came to the Sprolling household, they found an apartment littered with liquor bottles and other signs of neglect. Rather than being paroled home Joseph was sent to the Auburn Residential Center, operated by the New York State Office of Children and Family Services, 200 miles north of the city in Cayuga County. PSR ¶ 46. (Joseph recalls that members of his extended family, cousins and aunts who lived nearby, declined to take him in, causing a rift that continues to this day.)

2.     **Adolescence in Foster Care and Juvenile Facilities: 1995 to 2002**

Joseph remained at Auburn until he was twelve years old and had completed the sentence for his 1995 arrest. State officials again deemed his home situation unfit for his

6

return and he was brought into the foster care system. He was placed with the Williams family in Greece, New York, five miles north of Rochester. The Williams were a white married couple who lived in "a big, nice house." They had two children of their own and three foster children (including Joseph) who slept in a basement bedroom. The father was a Christian pastor, and the entire family attended church seven days a week. Joseph recalls being bullied by the other foster kids who were white and from local communities about the music he listened to and other aspects of the culture he grew up with.

He attended local public schools, completing ninth and part of tenth grade at Hilton Central High School, where he was one of very few Black students. He has good memories of the school. He competed in wrestling and track and recalls talking to a coach about applying for scholarships at boarding schools. But he struggled to live in the Williams home. When he was fifteen years old, he requested to be placed with another family. He was moved to a youth facility in Goshen pending placement. Unable to find a foster home, Joseph was sent to another group home in Middletown, where he remained for approximately two years. In 2002, when he was seventeen, he went back to the Bronx to visit and stayed.

### 3. Return to the Bronx; arrests and incarceration: 2002 through 2010

Joseph was seventeen when he returned to the Sprolling household. The living situation was even worse than when he was removed seven years prior. His stepfather had developed cirrhosis of the liver from chronic drinking and was no longer able to work. (He died four years later in 2006.) His mother was still abusing alcohol and cocaine. (She told the officer who conducted the presentence investigation that she has been drug and alcohol

7

free for twenty years. PSR ¶ 46.) And his older brother, Thomas, remained involved in the local drug scene. Soon Joseph was back on the street running crack for local dealers. He was arrested three times between October 22 and November 19, 2003, on College Avenue, the same place he had been arrested when he was ten. PSR ¶¶ 30 -32. In January of 2004 he was sentenced to one year and sent to Riker's Island. Released around August of 2004, he went back to the same drug scene in the Bronx. On November 14, 2005, he was arrested again on College Avenue.

While out on bail, his stepfather died. Despite struggling with drugs and alcohol Joseph's stepfather had been the most stable presence in his life. He was a good man who supported the family and was also a connection to a larger family of halfsiblings and cousins. Joseph, facing several years in prison, felt unmoored and depressed. He skipped bail and travelled to Virginia where he had cousins, accompanied by a friend from the neighborhood. He stayed in Virginia another two years. On March 27, 2007, when he was twenty-one, he was driving a rental car that his friend had obtained from a relative who worked at a car rental agency. Joseph knew that they were not authorized to drive the car. When police officers signaled to pull him over, he drove off, hitting a police vehicle, for which was charged with eluding the police and assault and battery (there were no injuries). PSR ¶ 34. He was held in Virginia for several months before being extradited to New York, where, in March of 2009, he was sentenced to 42 months (for the 2005 drug charges) and sent to New York State prison. PSR ¶ 33. (He was sentenced to five years in Virginia with all but six months suspended, which were completed before his return to New York. PSR ¶ 34) While in state prison he participated in programs for building maintenance,

8

"vocational shop" and "pre-high school equivalency." PSR ¶ 33. He has no disciplinary infractions (id), unusual for individuals who are incarcerated in their early 20s.

### 4. Working at the Barbershop and Convenience Store, Starting a Family: 2010 through January 9, 2024

Joseph was released to parole in 2010, when he was 25 years old, and discharged without incident two years later. While under supervision Joseph began to work at Sharp Styles Barber shop, owned by an old friend. Joseph had learned basic hair cutting while in prison but was unable to apply for a license because of his felony convictions. Instead, he worked as a receptionist and cleaner, occasionally cutting hair for a handful of clients, earning between $500 and $800 per week. PSR ¶ 76. In 2013 he also began to work at a convenience store across the street called 167 Convenience and Deli, earning about $400 a week. PSR ¶ 75. The next year, on December 9, 2014, Joseph was double-parked outside of the deli. NYPD officers approached, searched the car, and found a gun in the trunk. He was charged with criminal possession of a weapon in the fourth degree (a misdemeanor) and sentenced to three years of probation. PSR ¶ 35.

Joseph continued to work at the barber shop and deli for the next nine years. He knew these were dead-end jobs, and knew they were dangerous. There was a stick up at the deli and gun point robberies were common. Both the deli and the barbershop were social centers for the neighborhood and there were regular disputes over mundane issues that sometimes turned violent. Joseph felt concerned for his personal safety and, like many others, decided to keep a gun nearby. He did this even though he knew it was illegal, rationalizing that he'd rather deal with the legal system than the potentially fatal

9

consequences of an encounter in or near either shop. He also felt stuck. He had begun a relationship with Dominique Lang and moved with her to Bergenfield, New Jersey, driving in every day to work on 167th Street. He needed the steady money to support their son, Josiah, who was born in 2013. (They split up in 2016 and continue to co-parent together.) PSR ¶ 51.

But he didn't give up his search for something better. In 2019 a friend from the barber shop recommended that he apply to work as a plumber's apprentice. He started the program that July, working for New Era Mechanical Corp in White Plains, earning $20 per hour, more than he had ever made. He had been working there ten months when, in April 2020, he sustained a serious injury when his foot was "squished" in a forklift accident, causing multiple fractures. PSR ¶ 57. He received public assistance, but it wasn't enough. He had begun a new relationship with Eliana Fortuna around the same time he began the apprenticeship, and in 2021 they had a daughter. (Eliana, who already had four children, subsequently moved to Philadelphia. Joseph pays her child support.) He went back to work at the deli and barber shop to supplement his income while he recovered. (He completed physical therapy in early 2024.)

This was Joseph's life on July 19, 2023, when he was arrested for the firearm that forms the basis of the criminal charge in this case. He was charged in New York State Supreme Court, Bronx County and the case moved forward. He was referred to the Fortune Society and was completing programming towards a non-jail disposition. He immediately enrolled in two programs, "Anti-gun Violence / Anger Management" and "Up & Out: Exploring Our Thinking" earning certificates on August 23, 2023. In September he

10

completed an "Employment Services Workshop" and was referred to a construction training school where he completed courses on fall prevention, scaffold use, and drug and alcohol awareness. PSR ¶ 67. During the next several months he continued these classes and also began to attend classes in the addiction recovery field. He went to court on January 9, 2024, expecting an update on the disposition of his case. Instead, he was arrested by federal agents to answer the instant charges. Except to attend court appearances, he has not returned to the Bronx since his federal arrest.

## V. Joseph's Conduct Since the Federal Arrest Strongly Supports a Non-Incarceratory Sentence

Joseph has been under the supervision of District of New Jersey Pretrial Services for the past year and has been a motivated participant in all the employment trainings and services to which he has been referred. He completed construction safety trainings, including "Lock-out Tag-out Awareness Training", OSHA General Industry Training, 4-hour Forklift Training, 4-hour Aerial Lift and Lockout Tagout, 30-hour OSHA, 10-hour SST, and 4-Hour Flagger. PSR ¶ 67. He has also received a certificate of eligibility for participation in the federal bonding program, which encourages hiring by providing a six-month fidelity bond to potential employers at no cost. PSR ¶ 68. He also completed a one-week "job readiness" orientation conducted by the New Jersey Reentry Corporation. PSR ¶ 69. These are all in addition to the New York State trainings he took while on pre-trial release for the underlying Bronx County gun case. PSR ¶ 70 (noting that "Sprolling also also provided identification cards for the following: OSHA 3-hour General Industry Safety and Health; OSHA 30-hour Construction Safety and Health; NYS Department of

11

Transportation 4-hour Flagger; Forklift Operator; and MEWP Type 1 Group A & B; MEWP Type 3, Group A & B; and MEWP Operator.)

Joseph's hard work paid off and on June 10, 2024, he was hired as a full-time aircraft technician at Teterboro Airport, just a short drive from his home, where he works overnight cleaning private jets and stocking them with food and beverages for the next day's travel. PSR ¶ 72. He makes $20 an hour for five shifts a week, and more by accepting every extra shift he is offered. In his free time, he cares for his mother, who suffers from hypertension, diabetes, skin cancer and sciatica, which causes mobility issues. PSR ¶¶ 45, 47. His mother describes him as a "beautiful son and human being" and is grateful for the assistance he provides her at home. PSR ¶ 46.

## VI.  Conclusion

For the reasons discussed in this memorandum, Mr. Sprolling should be sentenced to a term of probation including a substantial period of home detention. Such a sentence is fair and just under the circumstances of this case.

Respectfully Submitted,

_____

Evan L. Lipton
Law Office of Evan L. Lipton, P.C.
*Counsel for Joseph Sprolling*